**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kevin P. McDOWELL,
Defendant–Appellant.**

**No. 89–3345.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 10, 1989.

Decided April 13, 1990.

Gregory G. Lockhart, Office of the U.S. Atty., Dayton, Ohio, for plaintiff-appellee.

Gary W. Deeds (argued), Columbus, Ohio, for defendant-appellant.

Before JONES and GUY, Circuit Judges, and ENGEL, Senior Circuit Judge.

RALPH B. GUY, JR., Circuit Judge.

Defendant, Kevin P. McDowell, appeals from the sentence imposed by the district court after conviction for cocaine-related

offenses. McDowell was sentenced after the district court accepted a plea bargain in which he agreed to plead guilty to conspiracy charges in return for the dismissal of the substantive offenses. The district court made an upward departure from the Federal Sentencing Guidelines and offered the following reasons for so doing: (1) the impact of the plea agreement was to reduce by half the potential guidelines sentence because it failed to account for the fact that the defendant was operating a crack house within 1,000 feet of two schools; and (2) at the time the guidelines were adopted, the Sentencing Guidelines Commission could not have taken into consideration the extreme threat to society that has developed due to the use and sale of cocaine base, or "crack."

Upon review, we conclude that the court acted reasonably in considering the fact that the defendant operated a crack house within 1,000 feet of two schools, but that this fact properly should have been taken into consideration as "relevant conduct" in the calculation of the base offense level rather than in making an upward departure. The second factor, by contrast, is not a proper justification for an upward departure from the guidelines. Because the extent to which the district judge considered each factor in calculating the sentence is unclear from the record, we remand, instructing the judge to resentence the defendant, considering the first factor when calculating the proper offense level and without considering the second factor at all.

## I.

On November 3, 1988, the federal grand jury at Columbus, Ohio, returned a three-count indictment against the defendant and his mother, Annie Chavis McDowell. The indictment charged the defendant in Count I with conspiracy to maintain a place for the distribution of cocaine and crack, in violation of 21 U.S.C. § 846.[1] Count II of the indictment charged the defendant with the unlawful possession with intent to distribute crack and approximately 84 grams of cocaine within 1,000 feet of two schools, in violation of 21 U.S.C. § 841(a)(1),[2] 21 U.S.C. § 845a(a),[3] and 18 U.S.C. § 2.[4] Count III related to Annie Chavis McDowell only and is not at issue in this appeal.

Pursuant to a plea bargain, McDowell pled guilty to Count I and the court, at the request of the government, ultimately dismissed Count II.

---

1. 21 U.S.C. § 846 reads: "Any person, who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

2. 21 U.S.C. § 841(a)(1) reads:

    (a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
    (1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance....

3. 21 U.S.C. § 845a(a) (Supp.1989) reads:

    **Distribution or manufacturing in or near schools and colleges**
    **(a) Penalty**
    Any person who violates section 841(a)(1) or section 856 of this title by distributing, possessing with intent to distribute, or manufacturing a controlled substance in or on, or within one thousand feet of, the real property comprising a public or private elementary, vocational, or secondary school or a public or private college, junior college, or university, or within 100 feet of a playground, public or private youth center, public swimming pool, or video arcade facility, is (except as provided in subsection (b) of this section) punishable (1) by a term of imprisonment, or fine, or both up to twice that authorized by section 841(b) of this title; and (2) at least twice any term of supervised release authorized by section 841(b) of this title for a first offense. Except to the extent a greater minimum sentence is otherwise provided by section 841(b) of this title, a term of imprisonment under this subsection shall be not less than one year. The mandatory minimum sentencing provisions of this paragraph shall not apply to offenses involving 5 grams or less of marihuana.

4. 18 U.S.C. § 2 (1969) reads:

    (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
    (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

A presentence report was prepared by the United States Probation Department, and a determination was made that the appropriate sentencing level for McDowell would be level 20 with a criminal history of III, which would call for a sentence of 41 to 51 months. In assessing the impact of the plea agreement, the probation department determined that, had the defendant been convicted of both counts, the appropriate offense level would have been 26, which would have increased the sentencing range to between 78 and 97 months.

At the sentencing hearing, but before announcing its sentence, the district court informed the defendant that the court was considering an upward departure as recommended by the probation department. After considering the argument of the defendant's counsel, and for the reasons set forth below, the court imposed a sentence of 96 months incarceration followed by a period of 60 months supervised release.

In support of its decision to depart from the guidelines, the court made the following statement:

> The Court concludes in this case that this is an appropriate case for an upward departure from the sentence recommended by the guidelines or the sentence provided for by the guidelines, and the Court would incorporate the comments that it made in the case of the co-defendant Annie Chavis McDowell with regard to, first, the fact that this offense involved maintaining a crack house and selling crack cocaine within 1,000 feet of two schools, and that the impact of the plea agreement was to, in effect, basically reduce by half the potential guideline sentence, but that doesn't change the fact that the plea is—the plea of guilty to maintaining a crack house and engaging in a conspiracy to maintain a crack house and engaging in a conspiracy to distribute cocaine within one thousand feet of two public schools.

> The Court reiterates its comments concerning the threat to public safety, the threat to the community, the fact that the guideline sentence as formulated for crack cocaine under these circumstances undoubtedly did not and could not at that time have taken into consideration the extreme threat to society which has developed through the use and sale of this particular drug.

## II.

The first factor that the judge considered in making his upward departure was the fact that the defendant operated his crack house within 1,000 feet of two schools. The judge stated his rationale for so doing in comments made during the sentencing of the defendant's mother and which he incorporated at the defendant's sentencing hearing:

> The Court agrees with the suggestion of the probation officer that this case represents a case in which the Court should depart upward from the guideline sentence. The main justification for reaching that conclusion is the one advanced by the probation officer, namely the fact that by virtue of the plea agreement, this defendant had been permitted to plead guilty to a conspiracy charge, a charge contained in count 1 of the indictment, and the government has agreed to drop the second charge which is based on the proximity of this crack house to a public school, actually two public schools. This crack operation was being carried on within one thousand feet of two public schools. Had that particular offense been pursued, there's no question about the fact that this defendant would have been liable for a substantially higher sentence.

■ Although the court was correct in taking this conduct into account, it erred in two respects. The primary error was that it considered the location of the crack house as a justification for an upward departure when it should have considered this conduct in calculating the defendant's base offense level. The guidelines are clear that conduct other than that for which the defendant has been convicted may be considered by the court in determining the appropriate sentencing range. Section 1B1.3 of the guidelines provides that, in determining the applicable guideline range

for an offense, "relevant conduct" includes "all acts and omissions committed or aided and abetted by the defendant . . . that occurred during the commission of the offense of conviction. . . ." Guidelines § 1B1.3(a)(1). This section does not address the proper grounds for *departure* from the guidelines.

In the recent case of *United States v. Sammy Lee Smith,* 887 F.2d 104 (6th Cir. 1989), this court held that it is proper to consider quantities of drugs charged in dismissed counts when determining the sentencing range. The court in *Smith* explained that "[i]n its sentencing determination, the district court should have considered all conduct that was part of the same course of conduct or a common scheme or plan as the offense of conviction. . . ." *Id.* at 108. This reasoning likewise applies in the instant case. The operation of this crack house close to two schools clearly is "conduct that was part of the same course of conduct" as the conspiracy. As such, the conduct should be considered when calculating the base offense level.

The circumstances of the instant case are somewhat different from the *Smith* case; thus, an expanded discussion is called for. In *Smith,* considering the conduct charged in the dismissed counts merely amounted to an increase in the quantity of cocaine used to calculate the applicable sentencing range. In the instant case, consideration of the dismissed count would require the court to consider the substantive offense that was the object of the conspiracy. The sentence imposed for the conspiracy charge, by definition, already considers the substantive offense that is the object of the conspiracy. Section 2D1.4 of the guidelines provides: "If a defendant is convicted of participating in an incomplete conspiracy . . . to commit any offense involving a controlled substance, the offense level shall be the same as if the object of the conspiracy . . . had been completed." However, the sentencing range made applicable does not automatically factor in the circumstance that this particular conspiracy was carried on within 1,000 feet of two public schools. Although there is no proof in this case that

the defendant sold crack to school children, the location of his crack house increased the availability of this deadly drug to children. That the defendant ran a crack house and that he did so in close proximity to school buildings is certainly "relevant conduct" within the meaning of section 1B1.3 of the guidelines.

Consideration of the location of the crack house in this case implicates section 2D1.3 of the guidelines, which provides that the base offense level is to be calculated "corresponding to double the drug amount involved . . . for distributing or manufacturing a controlled substance . . . within 1000 feet of a schoolyard." That is, the consequence in this case of considering the location of the crack house is to double the quantity of drugs considered in calculating the base offense level.

The court's second error was more one of verbiage than of substance. By stating that "the impact of the plea agreement was to, in effect, basically reduce by half the potential guideline sentence," the court seemed to be suggesting that it wished to remove the benefit·of the plea bargain by considering the location of the crack house. However, the defendant did receive the benefit of the plea bargain, because the dismissal of Count II precluded any possibility of a conviction for that offense. The conduct included in Count II is still "relevant conduct" within the meaning of the guidelines, however, and properly should be considered by the court when sentencing the defendant for his conviction on Count I.

### III.

We now turn to the second reason offered by the district court for its departure from the guidelines. The district court stated that running a crack house presents a threat to public safety and cited section 5K2.14 of the guidelines in support of its departure. This section reads:

If national security, public health, or safety was significantly endangered, the court may increase the sentence above

the guideline range to reflect the nature and circumstances of the offense.

Guidelines § 5K2.14.

This court recently adopted a three-part test for the evaluation of a departure from the guidelines:

First, we assay the circumstances relied on by the district court in determining that the case is sufficiently "unusual" to warrant departure. That review is essentially plenary: whether or not circumstances are of a kind or degree that they may appropriately be relied upon to justify departure is, we think, a question of law.

Second, we determine whether the circumstances, if conceptually proper, actually exist in the particular case. That assessment involves factfinding and the trier's determinations may be set aside only for clear error.

Third, once we have assured ourselves that the sentencing court considered circumstances appropriate to the departure equation and that those factors enjoyed adequate record support, the direction and degree of departure must, on appeal, be measured by a standard of reasonableness. 18 U.S.C. § 3742(e)(2).... In this context, reasonableness is determined with due regard for "the factors to be considered in imposing a sentence," generally, and "the reasons for the imposition of the particular sentence, as stated by the district court...." 18 U.S.C. § 3742(d)(3).

United States v. Rodriguez, 882 F.2d 1059, 1067 (6th Cir.1989) (quoting United States v. Diaz–Villafane, 874 F.2d 43 (1st Cir.), cert. denied, —— U.S. ——, 110 S.Ct. 177, 107 L.Ed.2d 133 (1989)).

■ While we agree that crack houses present a threat to public safety, we neither agree that the danger presented by crack houses in general is the type of special danger that section 5K2.14 was designed to address, nor that crack houses constitute "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b).

■ The First Circuit recently provided excellent guidance as to what factors are sufficiently unusual to warrant departure. In United States v. Aguilar–Pena, 887 F.2d 347 (1st Cir.1989), the court made the following statement:

[E]ach guideline should be seen "as carving out a 'heartland,' a set of typical cases embodying the conduct that [the] guideline describes." Manual § 1A4(b) at 1.6. It is only when the case before the court falls outside the "heartland" that departure comes into play.

Id. at 349. Our case is clearly a "heartland" case. The only thing about this case that distinguishes it from other crack house cases is the fact that the crack house is being operated close to two schools, and this circumstance was considered separately by the court. Quoting again from Aguilar–Pena, "there must be something 'special' about a given offender, or the accouterments of the crime committed, which distinguishes the case from the mine-run for that offense." Id. at 350. The trial judge made no other effort to distinguish this case from other crack cases. He merely stated that the Commission "undoubtedly did not and could not ... have taken into consideration the extreme threat to society which had developed through the use and sale of this particular drug." Again, Aguilar–Pena is helpful:

The basic flaw in the district court's reasoning is that it depends entirely upon the mere commission of the offense of conviction. The district court did not advert to, or rely upon, anything "different" about this case; to the exact contrary, the court's remarks would be equally applicable to any violation of 21 U.S.C. § 955 committed by any person, so long as it occurred in a Puerto Rican airport. Because the grounds for departure derived their essence from the offense itself, not from idiocratic circumstances attendant to a particular defendant's commission of a particular crime, the grounds, virtually by definition, fell within the heartland.

Id. at 351 (emphasis in original). As the First Circuit stated, the commission of the

offense of running a crack house, standing alone, is not sufficient grounds for departure.

Although we share the trial judge's concerns, we view the discretion exercised here as the type that, in the interest of eliminating sentencing disparity, was removed from district judges by the Sentencing Reform Act. To read section 5K2.14 as did the trial judge would be to provide an exception that swallows the rule. All narcotics offenses and most crimes present a threat to public safety of one kind or another, and clearly the Sentencing Commission was referring to a threat over and above that normally implicated by the commission of the offense.

We conclude with one last quote, which is relevant to the district court's departure:

> When, as here, a district court departs from the guidelines in reliance on factors adequately evaluated in the formulation of the guidelines, its "ruling indicates dissatisfaction with the guidelines rather than a reasoned judgment that particular characteristics of the offense ... have not been accounted for." *United States v. Nuno–Para,* 877 F.2d 1409, 1414 (9th Cir.1989). Judicial dissatisfaction alone, no matter how steeped in real-world wisdom, cannot be enough to trigger departures, lest the entire system crumble....

*Aguilar–Pena,* 887 F.2d at 353.

This case is REMANDED for resentencing consistent with this opinion.

NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.

I agree with the court's holding that the second reason for upward departure—the threat of "crack" to society—is not a proper justification. However, I believe that the district court's first reason for departure was also improper because the dismissed count of McDowell's plea agreement did not constitute "relevant conduct" for the district court to consider in sentencing. As such, I respectfully dissent from Part II of the opinion.

Pursuant to the plea agreement, McDowell pled guilty to one count of conspiracy to maintain a crack house and the government dismissed the count for possession of crack within 1,000 feet of a school with intent to distribute. However, the district court upwardly departed from the base offense level to sentence McDowell as if he were convicted of both counts of the indictment. Since possession within 1,000 feet of a school with intent to distribute contains a penalty much higher than that of maintaining a crack house, the district court approximately doubled McDowell's sentence. This court correctly notes that "the primary error [of the district court] was that it considered an upward departure when it should have considered the conduct in calculating the defendant's base offense level." Under section 1B1.3 of the Sentencing Guidelines, in determining the applicable guideline range, the district court may consider "relevant conduct," which includes "all acts and omissions committed or aided and abetted by the defendant ... that occurred during the commission of the offense of conviction." On this basis, the court holds that McDowell's maintaining a crack house within 1,000 feet of a school is relevant conduct that the district court could have properly considered in calculating the base offense level.

The Guidelines explicitly permit the district court to consider dropped counts of a plea agreement in cases where the quantities of drugs are added up for the purpose of calculating the offense level. The Commentary to section 1B1.3 of the Guidelines states that:

> [I]n a drug distribution case, quantities and types of drugs not specified in the count of conviction are nonetheless included in determining the offense level if they are part of the same course of conduct or part of a common scheme or plan as the count of conviction.

In *United States v. Smith,* 887 F.2d 104 (6th Cir.1989), this court held that it is proper to add up quantities of drugs from dropped counts because it was part of the same common scheme or plan as the offense of conviction.

In contrast, the instant case involves a different substantive offense specified in count two than in count one. The Guidelines are silent with respect to the nature of "relevant conduct" under these circumstances. Therefore, it is important to examine other sections of the Guidelines. Section 6B1.2 of the Guidelines gives the district court the authority to accept the plea agreement if "the remaining charges adequately reflect the seriousness of the actual offense behavior." In light of this section, I believe that a proper construction of the Guidelines does not allow the district court judge to sentence a defendant based upon dropped counts to a plea agreement where the dropped count is a substantively different offense with greater penalties attached. To allow sentencing based upon dropped counts would encourage the government to bootstrap charges in indictments, only to be brought up at sentencing, when the "beyond a reasonable doubt" standard no longer applies. In addition, there would be a serious disincentive to plea bargain agreements; no defendant would willingly plead guilty if the bargain was that he could not be convicted, yet still be sentenced, on the dropped counts of the indictment. Moreover, it would be fundamentally unfair to allow the district court to double a defendant's sentence based upon the greater offense which was dismissed, rather than on the lesser offense to which he pled guilty. If the district court believes that the charges remaining under the plea agreement do not adequately reflect the seriousness of the crime, then it should not accept the agreement. I think that this reading reflects the intent of section 6B1.2 of the Guidelines. I note that my construction of the Guidelines does not preclude the use of dropped counts in every circumstance, but only in those cases where the greater substantive offense was dropped as part of the plea agreement accepted by the district court.

Under this construction of the Guidelines, the district court's upward departure in the instant case was improper because it sentenced McDowell according to the greater offense, which was dropped under the plea agreement. This court correctly states that McDowell received the benefit of his plea bargain because it only specified that he would not be *convicted* of the dismissed count. However, the effect of the majority's decision is to allow sentencing for an offense of which McDowell was not convicted. My contention is not that the government did not live up to its end of the plea bargain in this particular case; instead, I submit that under a proper construction of the Guidelines, the district court should determine whether the seriousness of the crime is adequately reflected in the agreement at the plea bargain acceptance stage, not down the road at the sentencing hearing. Finally, I reject the court's suggestion that the conspiracy count included the dropped count—possession near a school with intent to distribute—as part of the conspiracy. If the government wanted to charge McDowell with such a conspiracy, it need not have agreed to the plea bargain. By dismissing the second count to the indictment, the government decided not to prosecute McDowell for this count. In so doing, it did not decide to then incorporate the dropped count into the conspiracy.

ENGEL, Senior Circuit Judge, concurring in part and dissenting in part.

I concur with parts I and II of the majority opinion, but respectfully dissent from the part III holding. In part III, the majority holds that it was error for the sentencing judge to base a departure from the Sentencing Guidelines upon the fact that crack, in contrast to ordinary controlled drugs within the Guidelines, is a particularly dangerous drug, as recognized by the majority opinion in several places, and that the public danger involved is even more serious when that form of drug is sold in close proximity to two public schools. In his comments, the sentencing judge expressed his opinion that the Guidelines did not make any apparent distinction between crack and other forms of controlled substances of that category and did not adequately address the dangers peculiar to the

use of crack in a setting such as this.[1] It seems to me that this is precisely the kind of intelligence the Guidelines are seeking to elicit from the trial judge, particularly in view of the Sentencing Commission's continuing duty to review and revise the Guidelines in the light of the experience it receives from the judges charged with responsibility for employing them in actual cases.

The thrust of the majority's reversal is that while it is acknowledged that crack houses present a threat to public safety, the majority cannot find that maintenance of such houses comes within the definition of "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b). My result, however, is to reach an entirely opposite position on basically the same law. I disagree that the trial judge made no other effort to distinguish this case from other crack cases in his departure. He clearly was concerned with the maintenance of the crack house within close proximity to two schools. He also was concerned with the fact that the Guidelines were deficient in failing to make a distinction for the particular seriousness of this drug, a distinction which he concluded could not have been drawn when the Guidelines were promulgated because the development was relatively new.

In my opinion, the majority unduly stresses the need for eliminating sentence disparity. A major objective of the Act unquestionably was to narrow the wide disparity in sentences, but it is evident from the Act, its history, and the comments of members of the Sentencing Commission that an equally important concern was the desire not to eliminate altogether the discretion of the sentencing judge where he or she could articulate a valid reason for the departure. The district court has done so here, and he has done so in the context of the facts in this case. While his observation concerning crack, as opposed to other forms of controlled substances, may be seen as a generalization, he did not indicate and does not appear necessarily to have sought to apply any automatic exception to the Guidelines which would be applicable in all cases. Thus, he has not violated the principle of uniformity of Guidelines, but instead has confined his decision to this particular case even though he partially based his departure upon what appears to be a growing realization of the specialized danger that the sale of crack imposes. I do not think it is invalid for this reason if he has not tried to make an automatic rule at variance with the Guidelines themselves and I cannot read that he was doing so here.

The majority opinion seems to hamstring the sentencing judge in a manner which I believe was not intended by either the Congress or by the Sentencing Commission which, indeed, hoped to get information from the front line of criminal law enforcement in order to assist it in its obligation to review the continuing appropriateness of the Guidelines.[2] Certainly if a judge can-

1. The trial judge correctly identified crack as a derivative of cocaine and hence as coming within the general categories of statutory Schedule II controlled substances, defined in Title 21. *See* 21 U.S.C. § 812(c), Schedule II(a)(4); *see also*, 21 U.S.C. §§ 841(a)(1) and (b)(1)(B). Other courts as well have recognized this. *See, e.g., U.S. v. Williams,* 876 F.2d 1521, 1525 n. 4 (11th Cir.1989); and *U.S. v. Maceo,* 873 F.2d 1, 2 (1st Cir.1989).

2. In the Guidelines Manual issued by the United States Sentencing Commission, the Commission had this to say concerning departures:

The new sentencing statute permits a court to depart from a guidelines-specified sentence only when it finds "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the

Sentencing Commission ...". 18 U.S.C. § 3553(b). Thus, in principle, the Commission, by specifying that it had adequately considered a particular factor, could prevent a court from using it as grounds for departure. In this initial set of guidelines, however, the Commission does not so limit the courts' departure powers. The Commission intends the sentencing courts to treat each guidelines as carving out a "heartland," a set of typical cases embodying the conduct that each guideline describes. When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted. Section 5H1.10 (Race, Sex, National Origin, Creed, Religion, Socio–Economic Status), the third sentence of § 5H1.4, and the last

not make such a distinction, then that kind of intelligence will not be available to the Sentencing Commission. This intelligence is particularly desirable where our court is granted by the statute the specific right to review upward departures for potential abuse. The sentence imposed here was within the maximum permitted by statute and the decision to depart was rational, as I think even the comment of the majority would reflect. In my opinion, the sentence has resulted in no injustice nor any unacceptable claim of disparity, a claim which must inevitably attend any attack upon the employment of upward and downward departure rules.

I believe that the majority has unduly limited the quality and nature of aggravating circumstances which can be used for upward departures. If the same rationale were to be applied in a conviction for felon in possession of a firearm, then I would suppose, by the same token, the sentencing judge would be unable to make any valid distinction between the use of a .22 caliber squirrel pistol and the use of a 155 mm howitzer. If and when the Sentencing Commission promulgates a different guideline for the use of crack, as opposed to other types of Schedule II controlled substances, then I would imagine it would be appropriate to require, as we did in part II of the majority opinion, that this circumstance be considered in determining the offense level rather than the extent of departure. Until then, it seems to me that this is precisely the kind of circumstances which the Sentencing Commission hopes will be called to its attention through use of the departure procedure. It is this continuing flexibility that gives the system whatever vitality it may have.

sentence of § 5K2.12, list a few factors that the court cannot take into account as grounds for departure. With those specific exceptions, however, the Commission does not intend to limit the kinds of factors (whether or not mentioned anywhere else in the guidelines) that could constitute grounds for departure in an unusual case.

The Commission has adopted this departure policy for two basic reasons. First is the difficulty of foreseeing and capturing a single set of guidelines that encompasses the vast range of human conduct potentially relevant to a sentencing decision. The Commission also recognizes that in the initial set of guidelines it need not do so. The Commission is a permanent body, empowered by law to write and rewrite guidelines, with progressive changes, over many years. By monitoring when courts depart from the guidelines and by analyzing their stated reasons for doing so, the Commission, over time, will be able to create more accurate guidelines that specify precisely where departures should and should not be permitted.

\* \* \* \* \* \*

... Of course, the Commission recognizes that even its collection and analysis of 10,000 presentence reports are an imperfect source of date sentencing estimates. Rather than rely heavily at this time upon impressionistic accounts, however, the Commission believes it wiser to wait and collect additional data from our continuing monitoring process that may demonstrate how the guidelines work in practice before further modification....

United States Sentencing Commission, *Guidelines Manual,* § 1A1.4(b) (Nov. 1989).